**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

```
UNITED STATES OF AMERICA      )
                              )
         v.                   )        1:15CR108-1
                              )
ISHAARD MARTAE SCALES         )
```

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case comes before the Court on the defendant's Amended Motion for Reconsideration of Detention Order (Docket Entry 57), which "moves the Court pursuant to 18 U.S.C. § 3143 and Federal Rules of Criminal Procedure 32.1 and 46 for reconsideration of the detention order entered on February 13, 2020 in consequence of his waiver of detention hearing entered the same day" (<u>id.</u> at 1 (referencing Waiver (Docket Entry 52) and Order (Docket Entry 53)). (<u>See</u> Docket Entry dated Apr. 14, 2020 (referring instant Motion to undersigned United States Magistrate Judge).) For the reasons that follow, the Court grants in part and denies in part the instant Motion, in that the Court has reconsidered the defendant's detention and has concluded that it remains appropriate.

<u>INTRODUCTION</u>

This case originally commenced with the return of an Indictment charging the defendant with possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1), and unlawfully possessing marijuana in violation of 21 U.S.C. § 844(a). (Docket Entry 1.) The defendant thereafter pleaded guilty to the felon-

firearm offense.  (<u>See</u> Docket Entry dated Sept. 11, 2015; <u>see also</u> Docket Entry 14 (Plea Agt.); Docket Entry 32 (Plea Hrg. Tr.).)

The Probation Office then prepared a Presentence Report (Docket Entry 20 (the "PSR")), which documented, inter alia, that:

A) the offense conduct charged in the Indictment occurred on June 24, 2014, when officers operating a license check-point encountered the defendant in a vehicle with "a baggie of marijuana on the floorboard next to [his] feet," after which they "asked [him] to get out of the car" and "patted [him] down," whereupon they "located a loaded .45 ACP Caliber Charles Daly pistol . . . on [his] right side inside the waistband of his pants" (<u>id.</u> at 4);

B) the defendant's criminal history (before June 24, 2014) includes four separate juvenile adjudications, arising from four separate incidents (from 2000 through 2002), for offenses of (1) possessing a handgun as a minor and assault with a deadly weapon, (2) breaking and entering, (3) assault, and (4) robbery with a dangerous weapon (two counts) and first degree burglary (arising from an incident in which "the defendant shot a man in the elbow, broke into [his] residence, and stole marijuana"),[1] as well as three additional sets of adult convictions, arising from five

_____

[1] The defendant (i) committed the breaking and entering and the assault offenses while on "probation" for the handgun possession and armed assault offenses (Docket Entry 20 at 6), and (ii) "absconded from [a] residential facility" while detained for the armed robbery and burglary offenses (<u>id.</u> at 7).

-2-

separate incidents (from 2004 though 2009), for offenses of (1) assault with a deadly weapon (two counts), possession of a stolen firearm, carrying a concealed gun, and resisting a public officer (arising from two separate incidents in which the defendant "shot [two different men each] in the left leg") and assault (arising from a third separate incident), (2) common law robbery (three counts), and (3) possession of a firearm as a felon and assault with a deadly weapon with serious injury (id. at 6-9);[2]

C) "the defendant was convicted of [m]isdemeanor [a]ssault on a [g]overnment [o]fficial/[e]mployee while in state custody for charges related to the instant offense" (id. at 18; see also id. at 10 (documenting conviction));

D) the defendant "was born [i]n . . . 1988" (id. at 11) and "reported that he was diagnosed with [an adverse health condition] in 2007, [for which he] takes daily medication" (id. at 13);

E) "[t]he defendant reported he was shot three times," first at "approximately 13 years old . . . in his left and right wrist,"

---

[2] The defendant (i) committed the armed assault, stolen firearm, concealed gun, and resisting offenses while on "post-release supervision" for the robbery and burglary offenses (id. at 7), (ii) committed the assault offense while released pending trial on the armed assault, stolen firearm, concealed gun, and resisting offenses (see id. at 7-8), (iii) "failed to report as directed[,] failed to remain in the jurisdiction as directed," and committed the three common law robberies, while on "supervised probation" for the armed assault, stolen firearm, concealed gun, resisting, and assault offenses (id.), and (iv) "failed to report as directed" and committed the felon-firearm and armed assault with serious injury offenses, while on "supervised probation" for the last of the three common law robbery offenses (id. at 8-9).

second "when he was 16/17 years old . . . in the right thigh," and third "in the chest" (id.; see also id. (describing medical records corroborating the defendant's reports of first and third shootings, placing third shooting in 2013, and documenting his "positive [test results] for cocaine and marijuana at the time of his [hospital] admittance [for third shooting]")); and

F) the defendant "admitted to the use of alcohol and marijuana," but "denied using any other illegal drugs" (id. at 14).

The Court (per Senior United States District Judge James A. Beaty, Jr.) later sentenced the defendant to 55 months in prison, followed by three years of supervised release with conditions that included "not commit[ting] another federal, state or local crime," "not unlawfully possess[ing] a controlled substance," "refrain[ing] from any unlawful use of a controlled substance," "not possessing a firearm," "work[ing] regularly at a lawful occupation unless excused by the probation officer," and "notify[ing] the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer." (Docket Entry 25 at 2-3; see also Docket Entry 33 (Sent'g Hrg. Tr.).)[3]

---

[3] In doing so, Judge Beaty "adopt[ed the PSR] with [only a] change[] . . . [to the defendant's] Base Offense Level . . . ." (Docket Entry 26 at 1; see also id. ("The Court determined that North Carolina common law robbery is a crime of violence [under the applicable guideline] but assault with a deadly weapon inflicting serious injury is not . . . .").)

The defendant completed that prison term and began supervised release on June 21, 2018. (See Docket Entry 50 at 1.) During the ensuing nine-plus months, the defendant repeatedly violated the (above-discussed) conditions, as evidenced by (1) four positive drug tests for marijuana, along with two other positive drug tests for both cocaine and marijuana, between June 29, 2018, and February 21, 2019, (2) his "fail[ure] to work regularly at a lawful occupation since his release," (3) his arrest on April 2, 2019, for (inter alia) possessing a firearm as a felon, resisting a public officer, and possessing drugs, and (4) his "fail[ure] to report his arrest on April 2, 2019 and h[i]s fail[ure] to contact the probation officer since th[at] date." (Docket Entry 50 at 1-2.)

An "incident report" describes the events surrounding the defendant's arrest on April 2, 2019, as follows:

> [O]fficers with the Reidsville Police Department attempted to conduct a traffic stop of [a] vehicle due to the vehicle only having one working headlamp. [An] officer initiated his blue light and siren in an attempt to stop the vehicle. The vehicle failed to stop and later collided with another vehicle. At that time, [the driver] got out of the vehicle and fled the scene on foot. The officer was not able to locate the driver and called for the assistance of a K-9 unit. Once the K-9 was on scene, officers initiated a human track. During the track, officers located a black bag and a Tarrus [sic] 9mm handgun, which was loaded with 11 rounds. Officers seized both items. Inside of the black bag officers located seven large bags of white powder and eight .5 mg clonazepam. The white powder, that was found in the black bag, has been sent [] to a lab for further testing.

-5-

The K-9 tracked to [an] address . . . in Reidsville, NC. The vehicle involved in the traffic stop was registered to the address. . . . Officers contacted [the vehicle owner] at this address and [the vehicle owner] gave the officers consent to search the residence. Once inside the residence, officers located [the defendant] lying in a bathtub. Officers noted that [he] was sweating and had cuts on his arms. [The defendant] also had a large amount of cash on his person at the time of his arrest, totaling $386.56. [The vehicle owner] advised officers that [the defendant] had possession of [the] vehicle and when [the defendant] arrived at the residence, he stated, "I just wrecked your car running from the police." [The defendant] was placed under arrest and taken to the Reidsville Police Department for processing. The vehicle that [the defendant] was driving was searched and impounded. Officer[s] located 1.5 grams of marijuana in the vehicle during this search. [The defendant] was placed under a $25,000 bond, which he posted on April 5, 2019.

A hearing in this matter was held on February 6, 2020 in Rockingham County Superior Court. [The defendant] plead[ed] guilty to Possession of a Firearm by Felon (19CRS050927) and was sentenced to 15 to 27 months. This sentence[] was suspended and [he] was placed on supervised probation for 18 months.

As part of [the defendant's] plea agreement the remaining charges . . . were dismissed.

(Id. at 1-2.)

Due to the above-described violation conduct, the Probation Office sought and the Clerk, on order of the Court (per United States District Judge Catherine C. Eagles), issued a warrant (see Docket Entries 41, 43, 44), which the United States Marshals Service executed on February 7, 2020 (see Docket Entry dated Feb. 7, 2020). The defendant (with the advice of counsel) then waived his right to a detention/preliminary hearing pursuant to Federal

-6-

Rule of Criminal Procedure 32.1(a)(6) and (b)(1) (see Docket Entry 52) and, by order dated February 13, 2020, the Court (per the undersigned Magistrate Judge) "accept[ed that] waiver," found "probable cause" for the alleged supervised release violations, and ordered "[the d]efendant [] detained" (Docket Entry 53 at 1).[4]

According to the Probation Office, "[p]ursuant to USSG §7B1.4(a), the [defendant's advisory] range of imprisonment applicable upon revocation is 18 to 24 months." (Docket Entry 51 at 2; see also id. ("[The defendant's] original conviction was a Class C Felony. Therefore, if supervised release is revoked, he may not be required to serve more than 2 years in prison." (citing 18 U.S.C. § 3583(e)(3))).) The Probation Office has recommended a "sentence[ at] the high of th[at advisory] range . . . ." (Id. at 3.) The Clerk initially set the final revocation hearing for March 30, 2020 (see Docket Entry 48), but (in the interest of limiting detainee movements and in-person gatherings) the Court (twice) has continued the hearing (most recently) to May 21, 2020 (see Docket Notice dated Mar. 16, 2020; Text Order dated Mar. 31, 2020), but

---

[4] The Probation Office recommended the defendant's detention "until his final revocation hearing. Th[at] recommendation [wa]s based upon [the] belief that [the defendant] has become a safety risk to himself and the community due to his continued drug use and new criminal conduct." (Docket Entry 51 at 3; see also id. (observing that, "[f]urthermore, there are no additional conditions, nor third party custodians known to the probation officer, which would guarantee [the defendant's] appearance before the Court or the safety of the community").)

with the caveat that, "[i]f and when video conferencing or teleconferencing becomes feasible, the Court will consider rescheduling the hearing using such technology on an earlier date, pursuant to the CARES Act and Standing Order 15" (id.).

The defendant (through counsel) filed the instant Motion (under seal) on April 13, 2020 (see Docket Entry 57) and the United States promptly notified the Clerk of its opposition (see Electronic Notice dated Apr. 14, 2020).[5]

## DISCUSSION

The instant Motion asks "the Court pursuant to 18 U.S.C. § 3143 and Federal Rules of Criminal Procedure 32.1 and 46 for reconsideration of the detention order entered on February 13, 2020 in consequence of his waiver of detention hearing entered the same day." (Docket Entry 57 at 1.) As grounds for that request, the instant Motion generally asserts that:

> [R]elease conditions can be fashioned that will establish by clear and convincing evidence that [the defendant's] release pending his final revocation hearing will pose neither a risk non-appearance nor a risk of danger to any person or the community. In light of the COVID-19 pandemic, the infection-amplifying conditions in congregative housing facilities like jails, his elevated

---

[5] After the Court prepared this Order, but before its docketing in the CM/ECF system, the United States filed a sealed response in opposition to the instant Motion (Docket Entry 58). Because the Court already had decided to deny the instant Motion and already had drafted the explanation for that decision before the United States made that filing, the Court did not consider that filing and will order it stricken to avoid confusion, as well as satellite litigation over the propriety of its sealing.

-8-

risk of adverse health consequences due to the virus and its effects upon persons with underlying health issues[, the defendant's] release is consistent with the aims of the Bail Reform Act and is in the interest of justice.

(Id.)  For the reasons that follow, the Court concludes that:

(A) the record (even as supplemented with the proffers made in the instant Motion) fails to establish by clear and convincing evidence that the defendant's release on available conditions would not pose a risk of community danger and/or of non-appearance; and

(B) the defendant has not constructed an adequate legal or factual foundation for release based on COVID-19/health concerns.

To begin, as to defendants (like the defendant) arrested for violating supervised release conditions, Federal Rule of Criminal Procedure 46 states:  "[Federal] Rule [of Criminal Procedure] 32.1(a)(6) governs release pending a hearing on a violation of . . . supervised release."  Fed. R. Crim. P. 46(d).  That cross-referenced subparagraph of Rule 32.1, in turn, provides:  "The magistrate judge may release or detain the person [arrested for supervised release violations] under 18 U.S.C. § 3143(a)(1) pending further proceedings.  The burden of establishing by clear and convincing evidence that the person will not flee or pose a danger to any other person or to the community rests with the person."  Fed. R. Crim. P. 32.1(a)(6).  Finally, under the statutory provision incorporated into Rule 32.1(a)(6), the defendant cannot obtain release "unless the judicial officer finds by clear and

-9-

convincing evidence that the [defendant] is not likely to flee or pose a danger to the safety of any other person or the community if released . . . ."  18 U.S.C. § 3143(a)(1).  On the record before the Court (as detailed in the Introduction and as supplemented by the instant Motion), the defendant has not carried his burden under these governing provisions.

In reaching that conclusion, the Court assumes that – despite its placement in a section of the Bail Reform Act not expressly made applicable to supervised releasees by Rule 32.1(a)(6) – 18 U.S.C. § 3142(f)[6] provides authority for reconsideration of a detention order under Rule 32.1(a)(6) and Paragraph (1) of Subsection 3143(a), when a supervised releasee-defendant, who previously had waived a hearing, subsequently has proposed a release plan, as the defendant has done here (see Docket Entry 57 at 3-4 (requesting release to "[h]ome confinement" in the "[t]hird-party custody" of his "girlfriend" at her residence in Reidsville with "[e]lectronic monitoring if feasible" and "[a]ny other

_____

[6] In pertinent part, the above-referenced Subsection provides:

The hearing [held under this Subsection] may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

18 U.S.C. § 3142(f).

-10-

conditions the Court deems reasonably necessary")). According to
the instant Motion, the defendant's "proposed conditions <u>rebut any</u>
<u>presumption</u> that his release poses an intractable risk of flight,
non-appearance or danger to the community." (<u>Id.</u> at 4 (emphasis
added).) Even if accepted at face-value, that assertion does not
entitle the defendant to release, because, under Rule 32.1(a)(6)
and Paragraph (1) of Subsection 3143(a), the defendant must not
simply identify information sufficient to <u>rebut a presumption</u> of
risk of danger/non-appearance and thereby thrust back onto the
United States the obligation of proving risk of danger by clear and
convincing evidence and/or risk of non-appearance by a
preponderance (as in certain other instances, <u>see</u> 18 U.S.C.
§ 3142(e)(2) & (3)); rather, as a function of his status as
supervised releasee, the defendant bears "[t]he <u>burden of</u>
<u>establishing by clear and convincing evidence</u> that [he] will not
flee or pose a danger to . . . the community," Fed. R. Crim. P.
32.1(a)(6) (emphasis added); <u>see also</u> 18 U.S.C. § 3143(a)(1)
(barring release "unless the judicial officer finds by clear and
convincing evidence that the person [seeking release] is not likely
to flee or pose a danger").

Given the defendant's criminal history and poor performance on
supervised release (as detailed in the Introduction), his mere
proffering of placement on house arrest with electronic monitoring
and his girlfriend as third-party custodian does not come close to

-11-

establishing a lack of risk of non-appearance or danger by clear and convincing evidence.  In that regard, the record reflects that, over the last two decades, the defendant, from the age of pre-teen to 30-plus-year-old man, has consistently committed dangerous criminal conduct, including shooting people three different times and robbing or assaulting additional victims on still other occasions.  He has perpetrated these acts of violence, as well as other firearm offenses, while on pre-trial release, probation, and post-release supervision (and, in one instance, while in custody). Neither imprisonment nor gun-shot wounds have deterred the defendant from resuming his armed-and-dangerous lifestyle.  He also repeatedly has absconded from or otherwise failed to report as directed for judicially-ordered oversight and routinely has resisted law enforcement officers, including most recently when he (A) crashed a vehicle, (B) during flight from a traffic stop, (C) while unlawfully possessing a firearm (and drugs), (D) within mere months of entry on supervised release, (E) after service of a substantial prison sentence for unlawful firearm possession (at which time he also unlawfully possessed drugs), and (F) thereafter ceased contact with his probation officer.

Put simply, the defendant's life-long pattern of dangerous criminal behavior and disregard for court-ordered obligations forecloses a finding under any standard (let alone by clear and convincing evidence) that his release on available conditions would

-12-

not pose an unreasonable risk of community danger and of non-appearance. As a result, the defendant must remain detained under Rule 32.1(a)(6) and Paragraph (1) of Subsection 3143(a).

Additionally, contrary to its assertion, the instant Motion has failed to show that, "[i]n light of the COVID-19 pandemic, the infection-amplifying conditions in congregative housing facilities like jails, [and the defendant's] elevated risk of adverse health consequences due to the virus [because of] its effects upon persons with underlying health issues[, the defendant's] release is consistent with the aims of the Bail Reform Act and is in the interest of justice" (Docket Entry 57 at 1). Of particular note, the instant Motion does not cite any provision of the Bail Reform Act, 18 U.S.C. §§ 3141, et seq., that would allow the Court to order the release of a defendant, otherwise subject to detention under Rule 32.1(a)(6) and Paragraph (1) of Subsection 3143(a), premised on COVID-19-/health-related considerations and/or general notions of the interest of justice. (See Docket Entry 57 at 1-4.) In any event, if the instant Motion had cited authority and/or had developed argument showing a lawful basis for reconsideration of the defendant's detention on such grounds, notwithstanding his inability to satisfy the terms of Rule 32.1(a)(6) and Paragraph (1) of Subsection 3143(a), the Court still would deny release as unsupported (at least on the present COVID-19/health record) and unreasonable (in view of the defendant's disturbing record).

-13-

Regarding COVID-19-/health-related concerns, the instant
Motion states (in its entirety) the following:

> [The defendant] is currently held in the Orange County
> Jail. . . . Due to the rapid spread of COVID-19, and the
> significant risk of infection within local detention
> centers, [the defendant] requests immediate release with
> conditions.

> The conditions of confinement at the Orange County Jail,
> like all jails, are necessarily close quarters. Even
> with the substantial efforts by the County to address the
> risk of infection, the pandemic conditions at the jail
> present an increased risk for infection to inmates
> directly; jail personnel indirectly and the community at
> large ultimately.

> [The defendant] is in a high-risk population. He suffers
> from [an adverse health condition]. He was first
> diagnosed with the condition at age 17 or 18. He has
> taken prescription medication for the condition since
> shortly after his initial diagnosis. (*See*[ Docket Entry
> 20 at 13.])

> He has been detained at the Orange County Jail since in
> or about October, 2019. Since that time his [adverse
> health condition] has been monitored daily. [That
> monitoring shows that his adverse health condition
> persists]. He receives medication for the condition at
> the jail daily. In [the defendant's ]case, the added
> precautions necessitated by the COVID-19 crisis,
> including increased isolation within the jail, risk
> exacerbating his condition.

> [The defendant] would be able, if released, to safely
> socially distance himself in accordance with recommended
> CDC [Centers for Disease Control and Prevention]
> practices. He would be able to live with his girlfriend
> . . . .

> [Her] residence is a two bedroom house where [she] lives
> alone. Occasionally her [minor] son, who resides with
> his grandmother, spends the night.

> . . . .

-14-

> . . . [The defendant's] underlying health issues make him
> uniquely susceptible to infection[] which, should it
> occur, would endanger everyone detained in the facility,
> their visitors as well as jail personnel.  Under these
> unique circumstances his release inures to the benefit of
> the greater Orange County community with minimal risk to
> this [C]ourt.
>
> Under the exigent circumstances created by the novel
> coronavirus and the extraordinary risk it poses to jail
> populations generally and to [the defendant] specifically
> and the existence of reasonable conditions for release
> that address any risk of nonappearance or danger to the
> community, this Court should release [the defendant]
> under the aforementioned proposed conditions, pending the
> final supervised release revocation hearing in his case.

(Id. at 2-4.)

As this quotation illustrates, the instant Motion provides no support for any of its above assertions, other than its citation to the PSR's recounting of the defendant's self-report of a long-standing adverse health condition (and medical management).  (See id.)  More significantly (again as the quotation reveals), the defendant does not contend that he presently faces actual exposure to the virus that causes COVID-19 at his detention site (see id.) and admits that local officials there have undertaken "substantial steps . . . to address the risk of infection" (id. at 2).

Accordingly, in the words used by another court in denying a detainee's COVID-19-related release request:

> [The defendant's] arguments [against] being incarcerated
> are general and speculative.  [He] argues that he is at
> greater risk of contracting COVID-19 given the lack of
> opportunity for social distancing at [his] facility.
> Unquestionably, avoiding crowds and social distancing are
> recommended to reduce the risk of transmission.  But [the

-15-

> defendant has not alleged] . . . any known cases of COVID-19 at the facility, and instead argues that an outbreak is inevitable. This argument is speculative.

United States v. Clark, No. 19-40068, 2020 WL 1446895, at *5 (D. Kan. Mar. 25, 2020) (unpublished) (internal citations omitted); see also United States v. Williams, Crim. No. 13-544, 2020 WL 1434130, at *2 (D. Md. Mar. 24, 2020) (unpublished) ("The [Emergency Motion for Reconsideration of Bond based on COVID-19] goes on to note that [detainees] are at special risk given their living situation. These are challenges that cannot be denied, but as they relate to the issue of release, they are concerns not concrete enough to justify the release of [the movant]." (internal citation and quotation marks omitted)); United States v. Jackson, Crim. No. 18-216, 2020 WL 1445958, at *2 (W.D. Pa. Mar. 24, 2020) (unpublished) ("[The movant] invites me to speculate that COVID-19 is present or imminent in the [facility that houses him] . . . justify[ing] the extreme measure of releasing him to home detention pending sentence. I do not agree that such a release is warranted by the facts of this case, or the actual circumstances at the jail.").

Furthermore, in light of the defendant's abysmal record, his proposal that the Court release him from custody because of the risk he may contract COVID-19 and return him to supervision in the community cannot stand the test of reason, as illustrated in this analysis from another court that confronted an analogous request:

-16-

[The defendant's] proposed release plan addresses only isolated aspects of public health officials' recommendations while ignoring other risk factors that would arise if he were released from custody. . . .

[The defendant] does not address the extent to which his risks could be exacerbated if he returns to [the community]. . . . [H]e offers no evidence to explain how [his proposed release plan] mitigates the risk of infection. For example, he does not . . . identify any screening practices or concrete COVID-19 precautions being taken [in his girlfriend's home]. He therefore offers nothing more than speculation that [his release plan] would be less risky than living in close quarters with others [in a jail] . . . . And he does not address . . . [his community] health care system's capacity to provide him with adequate treatment if he were to contract the virus. . . . [Government officials] ha[ve] ample motivation to prevent any outbreak at the [defendant's detention] facility and, even if an outbreak occurs, to contain and manage it for the well-being of all involved.

. . . .

In considering [the defendant's] release . . . based on circumstances related to COVID-19, it is also appropriate to consider the likelihood that the defendant's proposed release plan would increase COVID-19 risks to others, particularly if the defendant is likely to violate conditions of release. A defendant who is unable to comply with conditions of release poses potential risks to law enforcement officers who are already tasked with enforcing shelter-in-place orders . . ., [probation] officers who come into contact with th[at] defendant for supervision, and others if th[at defendant] is taken back into custody.

In this case, these considerations do not support release. . . . Given the [relevant] considerations discussed previously, the [C]ourt believes [the defendant] will likely violate any conditions of release the [C]ourt may impose if the [C]ourt were to issue a []release order. . . .

-17-

. . . [The defendant] has been unable or unwilling to remain law-abiding . . . . The [C]ourt has no reason to believe that he would suddenly become compliant now.

Meanwhile, supervising such a high-risk offender out in the community will place [probation] officers at heightened risk of contracting the virus. Location monitoring is not a limitless resource, nor is its installation and monitoring by [probation] officers without risk to those personnel (who must be trained and certified to install location monitoring) given the current recommendations regarding implementation of social distancing. And, when [the defendant] violates his conditions of release (as he likely will), law enforcement officers will be forced to expend valuable resources during a national crisis to take him back into custody . . ., both increasing the risk to them of contracting and spreading COVID-19 and further increasing the risk to the [jail] population when he inevitably returns to the facility. These additional considerations weigh in favor of denying the [instant M]otion.

Clark, 2020 WL 1446895, at *6-7 (internal citations and quotation marks omitted); see also Jackson, 2020 WL 1445958, at *2 ("I also must keep in mind the substantial burden that releasing . . . defendants would place on the U.S. Probation Office at a time when conditions already are not conducive to such monitoring.").

Finally, the Court notes that the defendant filed the instant Motion under seal (and asked that it remain sealed), because it "contains confidential medical information." (Docket Entry 57 at 4.) That approach does not comply with the Court's Local Rules, which direct that:

(a) If a party seeks to file documents or portions of documents under seal, that party should file a redacted, public version of the documents on the Court's docket, and should separately file a Motion to Seal. Complete, unredacted versions of the document or documents shall be

-18-

filed separately under seal.  The Motion to Seal should include a non-confidential description of what is to be sealed, identifying the documents or portions thereof as to which sealing is requested.

(b) If the party filing the documents is the party asserting confidentiality, the Motion to Seal should also be supported by a Brief, which may be filed under seal and which should:

    1. State the reasons why sealing is necessary;

    2. Explain (for each document or group of documents) why less drastic alternatives to sealing will not afford adequate protection;

    3. Address the factors governing sealing of documents reflected in governing case law; and

    4. State whether permanent sealing is sought and, if not, state how long the document should remain under seal and how the document should be handled upon unsealing.

M.D.N.C. LR 5.4 (bold font omitted); see also M.D.N.C. LCrR 57.1 (providing that Local Rule 5.4 "shall apply fully to criminal proceedings").  This Local Rule exists because of "the right of public access to documents filed in court, both under the First Amendment and the common law.  Motions to seal should be narrow and specific.  When only part of [a filing] is confidential, the moving party should not seek to seal the entire [filing] but rather should seek only partial sealing . . . ."  M.D.N.C. LR 5.4, comment.

    Nonetheless, "federal courts have found that the need to keep personal health information confidential may justify sealing certain documents."  Johnson v. City of Fayetteville, No.

-19-

5:12-cv-456, 2014 WL 7151147, at *11 (E.D.N.C. Dec. 11, 2014) (unpublished). Consistent with that view and to avoid deterring detainees from raising health-related issues for fear of forfeiting all medical privacy, the Court concludes that (subject to re-examination upon objection by any member of the public), even applying the more rigorous First Amendment standard, see generally Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir. 1988), the defendant's specific health condition (and related details) should remain off the public record, because such redaction "serves an important governmental interest and [] there is no less restrictive way to serve that governmental interest," id. The defendant either must comply with this limit on the scope of sealing by publicly filing a version of the instant Motion with the approved redactions or must file a motion for greater sealing.

## CONCLUSION

The Court declines to release the defendant, because, "[i]n summary, [he] has still failed to demonstrate by clear and convincing evidence that [his] release is appropriate [under Paragraph (1) of Subsection 3143(a)]. The existence of the present pandemic, without more, is not tantamount to a 'get out of jail free' card." Williams, 2020 WL 1434130, at *3; see also United States v. Adams, Crim. No. 19-257-3, 2020 WL 1457916, at *1 (D. Md. Mar. 25, 2020) (unpublished) ("[A]s troubling as the current COVID-19 situation is, it does not present the kind of

-20-

extraordinary reason [that requires] release."). In addition, the defendant must file either an unsealed version of the instant Motion that redacts only specific health information or a proper motion showing legal grounds for broader sealing.

**IT IS THEREFORE ORDERED** that the instant Motion (Docket Entry 57) is **GRANTED IN PART and DENIED IN PART**, in that the Court has reconsidered the propriety of the defendant's detention and has concluded that he remains subject to detention for failure to satisfy the requirements of Paragraph (1) of Subsection 3143(a) and/or to otherwise show an adequate legal and factual basis for release premised on COVID-19-/health-related considerations.

**IT IS FURTHER ORDERED** that, on or before April 23, 2020, the defendant shall file <u>EITHER</u> (A) an unsealed version of the instant Motion, redacted only to conceal the specific health condition identified on line 16 of page 2 and the related revelations following the phrase "Since that time" on line 21 of page 2 and ending at the period before the sentence that begins "He receives medication" on line 23 of page 2, <u>OR</u> (B) a motion justifying the sealing of additional material within (or the entirety of) the instant Motion. Failure by the defendant to comply with this Order will result in the instant Motion's unsealing without redaction.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

April 16, 2020

-21-